THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.* TOMÁS GALLETI RODRÍGUEZ, Defendant and Appellant.

No. CR-62-186.     Decided May 3, 1963.

*Rafael Toro Cubergé* for appellant. *J. B. Fernández Badillo, Solicitor General,* and *Juan A. Faría, Assistant Solicitor General,* for The People.

Division composed of Mr. Justice Belaval, as Chief Judge of Division, Mr. Justice Hernández Matos and Mr. Justice Santana Becerra.

MR. JUSTICE BELAVAL delivered the opinion of the Court.

On August 28, 1960, between half past seven and a quarter to eight in the evening, two automobiles collided at the intersection of Mattei Lluveras and Pasarell Streets in the town of Yauco. The automobile of the witness for The People of Puerto Rico, Luis Pérez Pérez, was traveling from west to east and that of defendant from south to north. According to the witness for the People, it was raining at the time of the accident—"the truth is that the visibility was not very clear, so to say, because the lights were on and the lighting of the town obstructed the view" (T.E. pp. 14–15). As to who hit whom, the witness for The People testified: "Let us say that we hit each other" (T.E. p. 15). They argued after the collision; defendant was "excited, as one usually feels after having a collision. That's the way everyone feels" (T.E. p. 16). When he was asked whether defendant had imbibed alcohol, he answered: "Well, apparently, but since we were quite apart. We talked loud . . . Apparently he had taken several beers, but I cannot say for sure . . . as to the manner of talking, we understood each other well, but we were talking excitedly" (T.E. pp. 16–17). After reading a written statement taken in the course of the investigation on defendant's condition at the time of the collision, the witness for The People answered: "I noticed, *according to the statement*, that apparently he was under the influence of intoxicating liquor," and that he had reached that conclusion because: "Well, the excitement of the moment, the way of talking . . . excitedly; he and I too" (T.E. pp. 18–19) . . . . When a person imbibes alcohol, you can tell by the way he talks (T.E. p. 19); that the witness noticed that *appearance* in defendant (T.E. p. 19). That in the opinion of the witness, "when one is in a state of intoxica-

tion, the way of talking is not normal . . . one stutters" (T.E. p. 20); that defendant talked as if he were "a little excited; I did not hear him utter obscene words . . . I cannot say that he was drunk . . . I have no words to describe the condition of a drunk person, and we talked and argued, and I concluded that he had taken some liquor. I cannot say for sure" (T.E. p. 21).

When Commonwealth policeman José A. Rodríguez Santiago arrived at the scene of the accident, he testified: "When I asked Mr. Galleti for his personal data, I noticed right away by the smell and the incoherent manner of talking that he had imbibed alcoholic beverages. He was impertinent" (T.E. p. 3). In describing for the first time defendant's condition, he answered: "Well, he was there . . . he could hardly give his personal data, he talked incoherently and smelled of liquor" (T.E. p. 4). When policeman Rodríguez was questioned by the defense attorney, he answered that defendant "was annoyed because he claimed that the other one was to blame" (T.E. p. 6), "he was excited" (T.E. p. 9), that defendant "did not talk coherently. Also, he was impertinent and smelled of rum" (T.E. p. 10). Policeman Rodríguez testified that defendant was impertinent because "I asked him for his personal data and he paid no attention to me; he continued arguing with the other" (T.E. p. 10); "that I noticed" that he was impertinent and smelled of liquor (T.E. p. 11).

When one hour later defendant was conducted to the municipal hospital of Yauco before Dr. Luis Manuel Velasco, the district attorney objected, and the trial court sustained him, to having the medical witness testify on the symptoms of drunkenness of defendant, but later, when he testified as defense witness, Dr. Velasco stated that he had talked with defendant in the municipal hospital and that he "talked well, normally," he did not stagger and was a little excited, not much, and that he had observed him for about ten or

fifteen minutes (T.E. p. 45). When the medical witness was about to testify whether or not, in his opinion, defendant was drunk, the district attorney objected and the trial court sustained him. The district attorney did not therefore cross-examine him.

The chemical expert evidence establishes that the result of the first urine test was 0.15 grams of alcohol in 100 grams of blood; the second was 0.13 against the scientific test employed to determine intoxication. Chemist Pedro A. Sierra Purcell testified: "It depends on the tolerance, on the physical condition of the person, on the emotional condition of the person, on his physique. It depends on all of that. He could not be or he could be. However, our conclusion is based on the theory which we have stated, that a person with 0.15 percent is in a state of intoxication irrespective of everything we have said about physique. That is the rule: that a person with 0.15 is in a state of intoxication. With less than that the person may or may not be in a state of intoxication. That depends on the persons who saw him, the physician who saw him and the police and other persons who may say that he was in a state of intoxication even with such 0.13" (T.E. pp. 38–39).

From the summary of the evidence which we have made it is clear that of the three symptoms of drunkenness on which the prosecution evidence rests—incoherent talking, antisocial behavior, smell of rum—incoherent talking is better related to the question of negligence than to the dangerous condition of drunkenness, in accordance with the juridical rule. As soon as defendant came out of the magic circle of the question, according to the uncontradicted testimony of Dr. Velasco, defendant talked well, he talked normally, and although he seemed a little excited, he was not more than what is reasonable. The change in the social behavior produced by the sudden emotional impact of a collision of automobiles is not contrary to human experience and should not

serve as basis to any extreme culpable inference. As to the smell of rum, the description is not sufficiently dramatic to infer a state of apparent drunkenness with its corresponding inference of danger.

■■ The expert witness accounts for the lower percentage of the alcohol as a possible evaporation of the contents when the containers are not tightly sealed. But he himself testified that when he made the second test the sample was tightly sealed (T.E. p. 34). Furthermore, defendant was a diabetic and according to the expert it is necessary to subtract 0.02 from the result obtained (T.E. p. 42), in which case the result of the first sample should also be corrected in accordance with the evidence. There is no question that in the complex play of the scientific hypothesis—science is considered nowadays a verified probability, contrary to the former criterion which considered it an established truth—a series of inculpatory or exculpatory conclusions may be established. However, it being our duty to find a person guilty beyond any reasonable doubt, the accusation should also satisfy a sense of justice.

The judgment appealed from will be reversed.